AD/SAT, A DIVISION OF SKYLIGHT, INC., Plaintiff,

v.

ASSOCIATED PRESS, Newspaper Association of America, National Newspaper Network, The Newark Star–Ledger, The Birmingham News Company, The Oakland Press Co., The News & Observer Publishing Company, Oklahoma Publishing Company, the Lexington Herald–Ledger, Dayton Newspapers, Inc., Cox Enterprises, Inc., Baltimore Sun Co., Inc., and Advance Publications, Inc., Defendants.

AD/SAT, A DIVISION OF SKYLIGHT, INC., Plaintiff,

v.

Donald E. NEWHOUSE, Defendant.

Nos. 94 Civ. 6655(PKL), 95 Civ. 2469(PKL).

United States District Court, S.D. New York.

Feb. 29, 1996.

Shulman, Gainsley & Walcott, P.A., Minneapolis, MN (Daniel R. Shulman, Phillip Gainsley, Terry M. Walcott, of counsel), Law

Firm of Joseph M. Alioto, San Francisco, CA (Joseph M. Alioto, of counsel), Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City (David E. Nachman, of counsel), for Plaintiff.

Rogers & Wells, New York City (Dennis J. Drebsky, Richard N. Winfield, Hilary C. Lane, John A. Nathanson, Edward C. O'Callaghan, of counsel), for Defendant Associated Press.

Cahill Gordon & Reindel, New York City (Patricia Farren, Nancy A. Kopans, of counsel), John F. Strum, General Counsel, Newspaper Association of America, Washington, DC, for Defendants Newspaper Association of America and National Newspaper Network.

Sullivan & Cromwell, New York City (Yvonne S. Quinn, Timothy J. Helwick, Tracey J. Bolotnick, Tamar Feder, Andrew Rotstein, of counsel), for Defendants Newark Morning Ledger Co., The Birmingham News Company, Advance Publications, Inc., and Donald E. Newhouse.

Dow, Lohnes & Albertson, Washington, DC (James A. Treanor, Timothy J. O'Rourke, Scott D. Dailard, of counsel), Treanor, Harvey, Sullivan, Trowbridge & Mullen, New York City (Michael R. Treanor, of counsel), for Defendants Cox Enterprises, Inc., and Dayton Newspapers, Inc.

Wilcox & Savage, P.C., Norfolk, VA (Frank A. Edgar, Jr., Conrad M. Shumadine, of counsel), for Defendant The News & Observer Publishing Company.

Wilmer, Cutler & Pickering, Washington, DC (A. Douglas Melamed, Esq., James W. Lowe, Esq., of counsel), Patterson, Belknap, Webb & Tyler, LLP, New York City (Philip R. Forlenza, of counsel), for Defendant The Oakland Press Company.

Lilly & Bienstock, Garden City, NY (Thomas J. Lilly, Jr., of counsel), for Defendant the Oklahoma Publishing Company.

Hughes, Hubbard & Reed, New York City (James B. Kobak, of counsel), Hughes, Hubbard & Reed, Washington, DC (Robert P. Resnick, of counsel), for Defendant the Lexington Herald–Leader.

## OPINION AND ORDER

LEISURE, District Judge:

AD/SAT alleges that defendant Associated Press ("AP") has violated Section 2 of the Sherman Act, see 15 U.S.C. § 2, by (1) attempting to monopolize the alleged market of electronic transmission of advertisements to newspapers; (2) engaging in monopoly leveraging; and (3) monopolizing the news and wire services markets. In addition, AD/SAT alleges that all defendants in this action have: (1) conspired to boycott plaintiff, in violation of Section 1 of the Sherman Act, see 15 U.S.C. § 1; and (2) conspired to monopolize the alleged market of electronic transmission of advertising to newspapers, in violation of section 2 of the Sherman Act. See 15 U.S.C. § 2. Pursuant to Fed.R.Civ.P. 56, AP moves for summary judgment as to AD/SAT's Sherman Act § 2 claims against it. In addition, all defendants move for summary judgment as to AD/SAT's Sherman Act §§ 1 and 2 conspiracy claims against them. Finally, AD/SAT moves for reconsideration of this Court's April 24, 1995 decision granting defendant the Lexington Herald–Leader's motion for summary judgment. Based on the following reasons, the Court grants all defendants' motions in their entirety, and denies AD/SAT's motion for reconsideration.

## BACKGROUND

This case is about the business of delivering advertisements from advertisers to newspapers. Traditionally, advertisements have been delivered from the advertiser, or advertising agency, to the newspaper by one of several means of physical delivery, including regular mail, messenger service, and overnight delivery service (such as Federal Express). By choosing to spend advertising dollars advertising in newspapers, as opposed to other alternatives such as television and radio, advertisers trigger the demand for delivery service, and they also typically select the means of delivery. In addition, advertisers normally bare the costs of delivery. At the current time, over 80% of all newspaper ads are delivered by overnight services such as Federal Express, with messenger service being the next most popular means of delivery.

An alternative means of delivering newspaper advertisements is electronic transmission. Electronic delivery of advertising involves the transmission of copy from advertisers to newspapers via satellite or terrestrial (i.e. land-based) means. Two of the parties in this litigation, AD/SAT and AP, deliver advertisements to newspapers over satellite networks. AD/SAT has been engaged exclusively in this activity since 1986, and it delivers its ads over a satellite network owned and operated by AP. AP, a cooperative association whose members consist of over 1,500 United States newspapers, is primarily engaged in the collection, assembly and distribution to newspapers of news and photographs. Recently, however, AP also began to deliver ads to newspapers electronically, also using its satellite network. Unlike the physical carriers such as Federal Express, which engage in a wide variety of delivery services, AD/SAT's and AP's services currently focus exclusively on the delivery of ads to newspapers. AD/SAT argues that AP's entrance into the business, which allegedly occurred with unlawful conspiratorial assistance from the remaining defendants in this litigation, violated the antitrust laws.

Defendant Newspaper Association of America ("NAA") is a non-profit trade association whose membership consists primarily of general circulation daily newspapers in the United States. NAA has 1,500 member newspapers in the United States and Canada. Its mission is to promote the interests of the newspaper industry, in part by encouraging the development of technological and marketing innovations that will enhance the efficiency and profitability of newspapers. Traditionally, one problem for advertisers advertising in newspapers has been the cumbersome billing process for placing a single ad in multiple newspapers. Formed in the spring of 1994, defendant Newspaper National Network ("NNN") is a limited partnership among a wholly-owned subsidiary of NAA and 48 of the 50 largest newspapers in the United States by circulation. To help overcome the perception of newspaper advertising as inefficient and cumbersome relative to other multi-market media competitors such

as television and radio, NNN has attempted to facilitate the simultaneous placement of advertising, at competitive prices, in all newspaper markets an advertiser wishes to reach. NNN has contracted with Publicitas Advertising Services, Inc. ("Publicitas") to serve as its "one order/one bill" clearing house for processing multi-newspaper insertion orders. NNN's goal is to attract new advertisers to newspapers, and it is therefore targeting five categories of national advertisers which typically spend less than five percent of their advertising budgets on newspapers ads.

The remaining defendants are individual newspapers or groups of newspapers, and one individual. Defendant Advance Publications, Inc. is owned by the Newhouse family. Defendant Donald E. Newhouse, the president of Advance, was, during times relevant in this litigation, a member of the Board of Directors of AP, and the volunteer Chairman of NAA. Through wholly owned subsidiaries, Advance owns defendants Newark Morning Ledger Co., which publishes *The Star-Ledger,* and The Birmingham News Company, which publishes *The Birmingham News.*[1]

Cox Newspapers, Inc., a wholly-owned subsidiary of defendant Cox Enterprises, Inc. ("CEI"), publishes fourteen newspapers of general circulation. One of these newspapers is the *Dayton Daily News,* a Dayton, Ohio newspaper of general circulation, which is owned by defendant Dayton Newspaper, Inc. ("DNI"), a wholly-owned subsidiary of Cox Newspapers. David Easterly, the president of CEI, is a member of the AP Board of Directors, and was a member of an AP Board ad hoc committee which assisted AP's management in investigating and planning AP's entry into the electronic advertisement business.

Defendant Oklahoma Publishing Company publishes an independent daily newspaper called the *Daily Oklahoman* in Oklahoma City, Oklahoma. Defendant the News & Observer Publishing Company publishes the *News & Observer.* Finally, defendant Oakland Press Company publishes *The Oakland Press,* a daily newspaper in Oakland County, Michigan.[2]

## A. The AD/SAT System

The AD/SAT system requires advertisers or advertising agencies to deliver a hard copy (or Velox) of an advertisement to one of two AD/SAT transmittal stations, which are located in Los Angeles and New York. The ad is then scanned into AD/SAT's system, and transmitted to the designated newspapers via the AP owned and operated satellite network. Next, the ad is received at each newspaper by an AP satellite dish, and forwarded to an AD/SAT installed and owned recorder, which produces a hard copy of the ad. Each recorder, which is essentially a high speed facsimile machine, costs approximately $62,000, with additional equipment, necessary to make the recorder operational, costing another $30,000.

AD/SAT's revenue is generated from service fees charged to both newspapers and advertisers. Advertisers are charged per ad transmission, and the amount per transmission decreases as the number of sites to which the ad is sent increases.[3] Because the costs of sending an ad to a single location over the AD/SAT system is much higher than physical delivery of a single ad, the system favors advertisers who send an identical ad to many different locations. Indeed, from its beginnings AD/SAT targeted national advertisers.

---

**1.** Advance owns 24 other newspapers, none of which are defendants in the instant action.

**2.** As noted *infra* p. 1295, the Court granted defendant the *Lexington Herald-Leader* 's motion for summary judgment nearly a year ago. On May 19, 1995, pursuant to a joint motion of AD/SAT and defendant *Baltimore Sun,* this Court issued an Order dismissing the *Baltimore Sun* from this action with prejudice.

**3.** Under the rate card effective prior to the filing of the instant motion, which had been in effect since August 1991, if an advertiser wishes to send a single ad to a single paper on the same day, the fee is $90. The best possible price per advertisement is $11.70, which applies if the advertiser wishes to have the ad delivered to 76 or more newspapers. However, as will be discussed *infra* p. 1299, in recent years AD/SAT has often worked out special rates for its larger customers.

All newspapers which joined the AD/SAT network before 1989 pay an annual affiliation fee of $7,500, while newspapers which affiliated with AD/SAT after that date pay an annual fee between $4,500 and $12,500, depending upon the size of the paper's circulation. In addition, newspapers pay reception fees for each ad received. Depending upon the affiliation agreement, which may have a duration of between three to five years, papers are charged either a flat rate of $28 per ad, or $25 for national ads and $20 for retail ads. Certain newspaper affiliates do not pay a reception fee for retail ads.

Of the 50 largest papers in the United States, 48 are AD/SAT affiliates, and of the next 100 largest, 60 are AD/SAT affiliates. While AD/SAT, at least through the date of the filing of this motion, continues to move more ads electronically than any other supplier, it still only delivers a small percentage of all ads placed in newspapers. In addition, AD/SAT has been unable to expand its network of newspaper affiliates. Because of the high fixed costs associated with the recorders, AD/SAT could not afford to waive the high reception and affiliation fees it demanded from newspapers. Therefore, expansion of the newspaper network to additional newspapers could not occur because the limited number of ads received would not justify the high costs. And, because of the limited size of the network, sending ads over the network remained very expensive to advertisers, who would often be compelled to pay quite a high per ad transmission fee. This lack of volume of ads sent over the network continued the necessity of retaining the high affiliation and reception fees to cover the fixed costs.

As early as 1990, AD/SAT recognized that the high costs associated with its system would preclude growth. At that time, the then-president of the company, Richard Atkins, made a conscious decision to stop acquiring recorders, and pursue converting the AD/SAT system to a digital one where much less expensive computers could be used as receivers. However, as a result of financial difficulties experienced by its former owner,

AD/SAT's movement into the newly developing digital market was extremely slow. Indeed, for the next several years AD/SAT's business stagnated.

On March 8, 1994, Skylight, Inc. purchased AD/SAT for roughly $4.1 million, including the assumption of certain liabilities. The new management, recognizing the existing problems, had plans to "revitalize and expand" the business, which, they assert, would have occurred but for the actions of AP and the other defendants.

### B. *The Development of AdSEND*

AP began to contemplate entering the business of electronic delivery of advertising in 1991. AP had recently introduced Photo-Stream, a high speed, satellite-based digital delivery system for the transmission of news photographs to newspapers, and saw the electronic delivery of advertising as a natural extension.

AP's approach to the business has been quite different from AD/SAT's. The approach is premised on the belief that unless AP's service could compete, both in price and service, with Federal Express and the other overnight delivery services which currently dominate the market, it could not build the network necessary to succeed. Therefore, AP installs reception equipment at the newspapers for free and does not charge the newspapers anything to receive an ad. Like the traditional approach to the business taken by Federal Express and others, all costs associated with the delivery of ads to newspapers are borne by the advertisers.

AP's business plan was approved by its Board in early April 1994, and the project, AP AdSEND, was announced to the public shortly thereafter, on April 25, 1994. The AdSEND system enables advertisers to transmit ads from the computers upon which they were created to the newspaper computers in digital form.[4] Thus, no hard copy of the ad is created until outputted on the newspaper's imaging equipment, meaning that the ad arrives at the newspaper as a first-gener-

---

4. The ad is actually first transmitted to AP's technical center in Cranbury, New Jersey, which is the AP AdSEND Hub. AP's central computer then checks to ensure that there have been no transmission errors, and sends the ad to the newspapers.

ation image, as though it had been printed by the advertiser and physically delivered.

While confident with its technical ability to deliver advertisements, AP, as a newcomer, knew very little about its advertising clients or the business of advertising in general. Therefore, along with conducting its own research, AP sought regular advice and assistance from NAA. The primary contact with the NAA was Newhouse, who, as mentioned above, was also an AP Board member, and the president of Advance. Before AdSEND was publicly announced, Newhouse helped arrange meetings between AP and NAA officials. After learning about AdSEND through these meetings, NAA began to encourage and support AP's efforts to enter the advertisement delivery business. After public announcement of the project, AP requested and received approval from NAA to participate in several NAA-sponsored conferences which focused on NAA's "one order/one bill" project. As discussed more fully below, this relationship between AP, Newhouse, and the NAA is at the heart of AD/SAT's conspiracy claim.

AD/SAT and AP are not the only companies which deliver ads electronically. Companies such as DigiFlex, Ad eXpress, AdStar, AdLink and Business Link are already in the market, advertisers are beginning to develop their own systems, and there is evidence that the regional Bell companies may soon enter the market.

## C. *Prior Proceedings*

Plaintiff appeared before this Court on September 14, 1994 seeking a temporary restraining order preventing AP from initiating its AdSEND program. The Court declined to issue the TRO, but ordered the parties to appear before the Court on September 23, 1994, at which time plaintiff's application for a preliminary injunction barring AP and those in active concert with it from initiating, providing, supplying, engaging in, contributing to or participating in the AdSEND program was denied. On April 24, 1995, this Court issued an Opinion and Order, granting the summary judgment motion of defendant the *Lexington Herald–Leader.*

## DISCUSSION

### I. *Summary Judgment in General*

■ Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and this burden will be satisfied if the movant can point to an absence of evidence to support an essential element of the nonmoving party's claim. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *Celotex,* 477 U.S. at 317, 106 S.Ct. at 2549 (failure of proof concerning essential element of nonmovant's claim renders all other facts immaterial). If the movant satisfies its burden under Rule 56(c), the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *see Celotex,* 477 U.S. at 317 & n. 3, 106 S.Ct. at 2549 & n. 3.

■ In assessing the record to determine whether there is a genuine issue as to any material fact, the evidence of the nonmovant is to be believed, and all reasonable inferences are to be drawn in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). However, to survive a motion for summary judgment in an antitrust litigation, the non-moving party must set forth facts that tend to preclude an inference of permissible conduct. *See Capital Imaging v. Mohawk Valley Medical Assoc.,* 996 F.2d 537, 542 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986)).

## II. *AD/SAT's Sherman Act § 2 Attempted Monopolization Claim*

Section 2 of the Sherman Act makes it unlawful for any person to attempt to monopolize any part of interstate trade or commerce. *See* 15 U.S.C. § 2. To succeed on its § 2 attempted monopolization claim, AD/SAT must establish (1) that AP has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

### A. *Dangerous Probability of Achieving Monopoly Power*

 AP argues that AD/SAT's § 2 attempted monopolization claim cannot succeed because there is not a dangerous probability that it will achieve monopoly power. "A party has monopoly power if it has 'a power of controlling prices or unreasonably restricting competition.'" *Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984) (quoting *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 389, 76 S.Ct. 994, 1003–04, 100 L.Ed. 1264 (1956)). The primary indicator of monopoly power is market share. *See Twin Lab., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990). Other factors to consider include the strength of competition in the market, barriers to entry into the market, and the probable development of the industry. *See International Distrib. Ctrs., Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 792 (2d Cir.) (citing *Hayden Pub.,* 730 F.2d at 68–69), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Before considering the factors necessary to determining whether a defendant has monopoly power in a relevant market, the Court must define the market.[5] *See Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965) (in a § 2 attempted monopolization claim, definition of relevant market necessary to determine defendant's ability to lessen or destroy competition). The relevant market may be either a geographic market, or a product or service market. In this case the parties concede that the geographic market is the United States, but contest the definition of the relevant service market.

In its First Amended Complaint, AD/SAT states that the relevant market in this action is the electronic transmission of newspaper advertising. *See* Plaintiff's First Amended Complaint ¶ 22.[6] While some of the language is ambiguous, in its opposition papers to defendants' motions, AD/SAT appears to alter its definition of the relevant market in this action. Relying on the affidavit of its expert witness, Dr. William S. Comanor, AD/SAT limits its definition to a "rush" market for advertisement delivery, where only providers which can deliver ads in less than three hours compete. *See* Affidavit of William S. Comanor in Opposition to Summary Judgment Motion ("Comanor Aff.") ¶¶ 8, 10.

Regardless, neither relevant market offered by AD/SAT is persuasive. Rather, consistent with the conclusion offered by this Court in denying AD/SAT's motion for a preliminary injunction, the Court finds that the relevant market in this action is the delivery of advertisements by any means.

---

5. In the appropriate case, market definition may be decided on summary judgment. *See Belfiore v. New York Times Co.,* 826 F.2d 177, 180–81 (2d Cir.1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988).

6. Actually, AD/SAT's complaint alleges that the transmission of ads to newspapers is a relevant market, and that the electronic transmission of ads is the relevant submarket in this case. The Supreme Court has stated that within broad product markets "well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct.

1502, 1524, 8 L.Ed.2d 510 (1962). The required analysis does not change whether a particular product market is deemed a market or a submarket. *See H.J., Inc. v. International Tel. & Tel. Corp.,* 867 F.2d 1531, 1540 (8th Cir.1989) ("[T]he same proof which establishes the existence of a relevant product market also shows ... the existence of a product submarket."). Academic commentators have argued that the use of the term submarket draws no meaningful distinction, and only serves to create confusion. *See* 2A Phillip E. Areeda et al., *Antitrust Law,* ¶ 533 (1995). The Court agrees, and restricts itself to use of the term "market".

The Supreme Court, in *duPont,* 351 U.S. at 404, 76 S.Ct. at 1012, defined the relevant market as consisting of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Id.; see also Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28, 81 S.Ct. 623, 627–28, 5 L.Ed.2d 580 (1961) (relevant market defined as the "areas of effective competition" within which defendant operates); Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust,* 90 Colum.L.Rev. 1805, 1806 (1990) (" 'definition of relevant market' is an attempt to describe the array of firms that currently produces or potentially will produce products that are sufficiently close substitutes to take business away from any firm or group of firms that attempts to exercise market power."). Products or services need not be identical to be considered reasonably interchangeable. *See duPont,* 351 U.S. at 394, 76 S.Ct. at 1006–07 ("where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others."). Rather, determination of whether a product or service is reasonably interchangeable requires consideration of the cross-elasticity of both demand and supply. If customers would respond to a small price change in a product by changing to another product, then there is a high cross-elasticity of demand between the products. In such a case, the products are reasonably interchangeable, and therefore compete in the same market. *See United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524; *duPont,* 351 U.S. at 400, 76 S.Ct. at 1009–10. Cross-elasticity of supply refers to "the extent to which producers will be willing to shift their resources from supplying a product or service in one market to supplying a product or service in a different market in response to price changes in the second market." Associated Press' Memorandum of Law in Support of Summary Judgment at 23 (citing *Telerate Sys., Inc. v. Caro,* 689 F.Supp. 221, 237–38 (S.D.N.Y.1988)). Determining the cross-elasticity of supply also requires consideration of new, start-up entities which may enter a market.[7]

The evidence supports the conclusion that the relevant market in this case is the delivery of advertisements by any means. First, it is undisputed by both AD/SAT and AP that currently the predominant method of advertisement delivery is provided by overnight services such as Federal Express. AD/SAT's President David Hilton so stated in his deposition. *See* Deposition of David A. Hilton at 822. Indeed, a business plan prepared by AD/SAT's own consultants, Bain & Company, found that over 80% of all ad delivery services is provided by overnight carriers. *See* DX[8] 2 at 750; Deposition of Sam Rovit at 315.[9]

Considering the extensive financial resources and existing capital, both human and physical, possessed by overnight carriers as Federal Express and the United States Postal Service, it is not surprising that they deliver such a large percentage of the ads sent to newspapers. Whatever their limitations, these services have developed and earned reputations for dependability and timeliness.

Since its inception, as revealed by the deposition testimony of its founder and first president, Neil Hayden, AD/SAT understood

---

7. AP internal documents reveal that AP officers, when stating they hoped to "capture" the market, often were referring to the electronic delivery market. For antitrust purposes, however, the relevant market is determined by reasonable interchangeability, as evidenced by cross-elasticity of demand and supply, not by laymen's comments made in a competitive business environment. *See Nobel Scientific Indus. v. Beckman Instruments,* 670 F.Supp. 1313, 1318–19 (D.Md. 1986), *aff'd,* 831 F.2d 537, 538 (4th Cir.1987), *cert. denied,* 487 U.S. 1226, 108 S.Ct. 2886, 101 L.Ed.2d 920 (1988).

8. Exhibits are identified as PX for plaintiff's exhibit and DX for defendants' exhibit.

9. A marketing study prepared in March 1994 for AP by Clark, Martire & Bartolomeo, Inc. found that 84% of advertisements were delivered by overnight services. *See* Affidavit of Hillary Lane, Esq. Ex. 115 at 9. *See also* Affidavit of Almarin Phillips in Support of Summary Judgment ("Phillips Aff.") at ¶ 13.

that it is in competition with Federal Express and other overnight couriers. *See* Deposition of Neil S. Hayden at 178. While it is true that AD/SAT viewed AP and other electronic delivery providers as its primary competition, because it viewed electronic delivery as the wave of the future, the Bain Report reveals that AD/SAT knew that capture of some of the customers of the overnight couriers was necessary to the expansion of AD/SAT's network, which was essential to AD/SAT's survival.

AD/SAT, however, has been unable to compete in that market because its high capital costs have precluded it from pricing its service at rates comparable to Federal Express and other physical delivery sources. While overnight carriers such as Federal Express charge advertisers $7 to $15 per ad, *see* Affidavit of Patrick T. O'Brien in Support of Summary Judgment ("O'Brien Aff.") Ex. D at 7, 8, AD/SAT charges advertisers between $20 and $30 for each non-express ad delivered. Once the affiliation and reception fees charged to newspapers are added to the total cost, it is obvious that AD/SAT's prices are not competitive with overnight carriers. The fact that, nearly a decade after AD/SAT began delivering ads electronically, over 80% of ads are still delivered by physical means, with messenger service being the next most popular means of delivery, indicates that AD/SAT's inability to price competitively with physical carriers precluded it from succeeding in its goal to expand the size of its network, and the volume of ads it delivered. While it is true that electronic delivery of ads provides benefits which physical delivery cannot provide—such as greater speed and reliability in all weather conditions—the continued dependance upon physical means of delivery is evidence that, unless priced competitively, electronic services will not be accepted by the market.

In contrast to AD/SAT, AP entered the market knowing that a pricing scheme which was competitive with the overnight carriers is essential to success. *See* Affidavit of Terry M. Walcott, Esq., in Opposition to Summary Judgment ("Walcott Aff.") Ex. 123 at 3, 6; O'Brien Aff. ¶ 8. As noted above, newspapers pay nothing to receive ads over the AdSEND system. In addition, advertisers, depending upon the number of ads sent in a given year, pay between $4 and $8 for ads delivered within a 12–hour period, and $6 and $12 for ads delivered within a 4–hour period. *See* AP's Reply Memorandum in Support of Summary Judgment at 11 n. 11. AP realized the key to success would be quickly to establish a large network of advertisers and papers using AdSEND. The only way to achieve this goal was to provide a more effective service at competitive prices.

AD/SAT's primary objection to AP's argument that AdSEND's pricing structure reveals a high cross-elasticity of demand in the delivery of advertisements by any means market centers around the fees charged by AP for ads delivered within one hour. AD/SAT concludes that because AP charges $40 per ad for ads delivered within one hour, regardless of the volume of ads sent, "AP effectively acknowledges that there is a distinct class of buyers who cannot use overnight delivery methods and is willing to pay substantially more for rush delivery." AD/SAT supplements this conclusion by noting that, according to its rate cards, it charges a premium price of $58 for ads delivered within three hours. In essence, as stated above, AD/SAT appears to be arguing that these "rush" services, for which all parties admit there is no non-electronic substitute deliverer, constitutes a separate market.

For several reasons, the Court is not persuaded by this argument. First, despite the statements made by Dr. Comanor, *see* Comanor Aff. ¶ 33, the Court finds that AD/SAT has not identified a class of advertisers for which this service is a regular necessity. Indeed, AD/SAT has supplied no evidence that even one advertiser requires rush delivery on a regular basis. Certainly it is true that there will be a certain class of situations where express service is needed—namely, when advertisers, by some happenstance, fail to get an ad prepared in a timely fashion. But this is insufficient to create a market for the service. Considering that for years AD/SAT was the exclusive provider of this rush service, if it were anything but an emergency remedy used occasionally by a wide range of advertisers, one would think that AD/SAT

would have prospered. However, the opposite happened. AD/SAT's own acknowledgment of the need to increase the volume of its deliveries by reducing its fees in order to survive indicates that there is not a steady class of advertisers who need regular express service.

It is true that AP projects that 30% of its ads will be delivered on a rush schedule, and a premium price of $40 per ad will be charged for such service. Again, however, there is no evidence that any advertisers will use the rush service on a regular basis. Indeed, AP's strategy is to price its four-hour and overnight service at levels comparable to the dominant overnight carriers. The availability of a rush service, without evidence that there is a class of advertisers who will regularly use it, is simply a supplemental feature of AP's service which is intended to convince advertisers to use AP's service, as opposed to Federal Express or another deliverer.[10] This does not create a separate market for antitrust purposes because products or services need not be fungible to compete in the same market. *See United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964) (relevant market defined not by product fungibility, but by meaningful competition).

AD/SAT's current contracts with some of its larger advertiser clients reveals that its rush service is simply an additional aspect of a larger package to attract advertiser customers. In many of these contracts the advertiser does not pay any additional fee for rush delivery, up to a certain number of advertisements. *See* Hilton Aff.Ex. E. (reproducing six AD/SAT contracts which support stated proposition). For example, AD/SAT's current contract with Lord & Taylor, one of its major clients, provides that Lord & Taylor will pay an annual fee of $184,000, which entitles Lord & Taylor to send up to 8,250 ads. Of those 8,250 ads, 800 may be

sent priority service at no extra charge, with a $20 premium per ad beginning thereafter. From this it seems evident that AD/SAT's rush service is simply one aspect of a larger package of services which AD/SAT offers in an attempt to succeed in the competition for advertiser dollars.

In sum, both AD/SAT and AP admit that they are in competition with non-electronic ad delivery providers. Furthermore, AP, after studying the ad delivery business before entering the market, has priced its service to compete with Federal Express and other physical deliverers. Therefore, the Court finds high cross-elasticity of demand in the market of the delivery of advertisements by any means. Because AD/SAT cannot identify any class of advertisers which consistently depend upon the availability of rush services which only electronic deliverers can provide, the premium charged for such services does not create a separate market. Rather, the ability to provide rush delivery is simply an additional feature of the overall service for an advertiser to consider in choosing which ad deliverer to use.

The Court also finds high cross-elasticity of supply in this market. As mentioned above, the current dominant deliverers of newspaper ads, the overnight carriers, are large companies with great financial strength and businesses which extend well beyond this market. It is simply implausible to think that the development and implementation of AP AdSEND could drive these competitors out of the ad delivery business. It certainly could not drive them completely out of business. Therefore, even if driven out of the ad delivery business, if AP attempted to exercise market power by raising prices to supracompetitive levels, the overnight carriers could easily and quickly reenter the market.

In addition, the barriers to entry into this market, as AD/SAT conceded in its First Amended Complaint, are low.[11] As noted

---

**10.** Following AD/SAT's reasoning, because AP's rush service delivers ads in one hour, and AD/SAT's rush service takes three hours, it appears that the Court would be compelled to treat each of these as separate market.

**11.** Paragraph 23 of the First Amended Complaint states:

At present, the market for the transmission of newspaper advertising, as well as the electronic transmission submarket thereof, is characterized by low concentration, vigorous competition, rapid technological development, and ease of entry relative to the three other relevant markets, in which Associated Press occupies a monopoly position. Up to the time of

*supra* p. 1295, not only are electronic deliverers such as DigiFlex, Ad eXpress, AdStar, AdLink and Business Link already in the market, but advertisers are beginning to develop their own systems, and there is evidence that the regional Bell companies may soon enter the market. In short, there is high cross-elasticity of supply in the market defined by the Court.

■ Having determined that the relevant market in this case is the delivery of advertisements by any means, it is evident that AP lacks sufficient monopoly power to allow AD/SAT's § 2 attempted monopolization claim to survive the instant motion.[12] Reviewing the factors to consider in determining market power which were set forth *supra* p. 1296, the Court first notes that AP, a new entrant into a market where over 80% of all ads are delivered by overnight carriers, obviously possesses an insignificant market share. While the Court of Appeals for the Second Circuit is unwilling to base market power determinations solely on market share data, *see Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 128 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981), such data is treated as strong evidence of the absence or presence of market power. *See id.* Many courts in the Second Circuit have found market shares of less than 50% or even 60% insufficient to support an attempted monopolization claim. *See id.* (citing cases). In *Twin Lab.*, 900 F.2d at 569, the Second Circuit stated that "[w]e have held that a 33% market share does not even approach the level required for dangerous probability of success." (citing *Nifty Foods Corp. v. Great*

*Atl. & Pac. Tea Co.*, 614 F.2d 832, 841 (2d Cir.1980)).

Another factor to consider in determining monopoly power, competition in the market, also weighs heavily against AD/SAT's attempted monopolization claim when one considers the strength of competitors such as the overnight carriers. In addition, as mentioned above, the barriers to entry into the market are low. *See United States v. Waste Management, Inc.*, 743 F.2d 976, 983–84 (2d Cir.1984) (in market where barriers to entry were insubstantial, projected 48.8% market share of company after merger insufficient to support a finding of monopoly power).[13] Finally, while predictions about developments in this industry would be speculative at this time, assuming, as AD/SAT and AP do, that electronic transmission is the wave of the future, the low barriers to entry for providers using this method of delivery does not create any inference that AdSEND will establish market power.

AD/SAT cannot show that there is a dangerous probability of AP achieving monopoly power in the delivery of newspaper advertising market. Therefore, an essential element of its § 2 attempted monopolization claim fails and, accordingly, summary judgment is appropriate.

**B. *Predatory or Anticompetitive Conduct***

■ In order to prove an attempted monopolization claim, a plaintiff must show that a defendant engaged in predatory conduct. In this case, AD/SAT asserts that AP engaged in such conduct by (1) prematurely announcing and implementing the AdSEND

the announcement by Associated Press of its intention to enter the transmission market, newspapers have acted according to their interest in receiving the best possible product at the lowest possible price, and have entered into no arrangements or agreements to foreclose competition on the merits by competitors in the transmission market and the electronic transmission submarket.

Setting aside the merits of AD/SAT's conspiracy argument contained in this paragraph, which will be discussed *infra* part V.A, AD/SAT concedes that barriers to entry are low.

**12.** AD/SAT's arguments in support of its attempted monopolization claim, as they must, do not attempt to establish that there is a reasonable

likelihood of monopolization of the market defined by the Court, but rather assumes a market restricted to electronic delivery. *See* Pl's.Opp. at 80.

**13.** It is true that both AP and AD/SAT view electronic delivery as the wave of the future. And, AP's own records indicate that it expects to achieve deep market penetration among larger-volume advertisers. *See* PX 175. However, a firm's market share is measured "when it undertakes the challenged anticompetitive conduct." *Walsh Trucking*, 812 F.2d at 791. Therefore, standing alone, AD/SAT's reliance on AP's projected market share is not persuasive evidence.

program; (2) engaging in predatory pricing; (3) leveraging its news and photo monopolies; and (4) participating in a concerted refusal to deal with other defendants. The leveraging and refusal to deal claims are discussed in sections III and V, respectively, of this Opinion and Order. The Court will now address, separately, the premature announcement, essential facilities, and predatory pricing claims.

### 1. *Premature Announcement of AdSEND*

 AD/SAT asserts that AP engaged in anticompetitive conduct in furtherance of its attempt to monopolize the market by prematurely announcing and implementing AdSEND, "at a time when AP knew that AdSEND was not and would not be functional," Pl's.Opp. at 82–83, with the "express purpose of foreclosing competition from AD/SAT and other electronic delivery services." *Id.* at 83. The facts of this case do not support such a claim. When publicly announcing AdSEND on April 25, 1994, AP stated that the program would be tested over the summer and launched in September. Testing was done in the summer, and while glitches remained in the system throughout the fall of 1994, *see* PX 775, 778, 786, the system was operating successfully shortly after the time AP projected. *See* Affidavit of Thomas Brettingten in Support of Summary Judgment ¶¶ 4–8. Regardless, as conceded by AD/SAT, preannouncement of a product or service constitutes predatory conduct only when the announcement is knowingly false. *See MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1128–30 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *see also Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 287–88 & n. 41 (2d Cir.1979) (unless it amounts to deception, advertising by competitor with significant market share showing product in best light cannot be anticompetitive conduct), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). There is no evidence in this case to support the claim that AP knowingly made false statements in announcing AdSEND, and there is some evidence to contradict it. *See* PX 775 (document indicates that AP officer involved with AdSEND unaware of production problems).

### 2. *Predatory Pricing*

 A predatory pricing scheme is " 'the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition.' " *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 86 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982) (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 711b, at 151). The Supreme Court recently held that, in attempting to establish a predatory pricing scheme, a plaintiff must first show that the prices charged by a defendant are "below an appropriate measure of its [ ] costs." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993). However, in *Brooke Group,* the Court, as it had before, declined to resolve the lower courts' conflict over the appropriate measure of costs. *See id.* at 223 n. 1, 113 S.Ct. at 2587 n. 1; *see also Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986); *Matsushita,* 475 U.S. at 585 n. 8, 106 S.Ct. at 1355 n. 8.

The total cost of production may be divided into two rough categories—fixed costs, which are borne by the firm whatever level of output it produces, and variable costs, which vary with the level of output. *See Northeastern Tel.,* 651 F.2d at 88. Fixed costs typically include some management expenses, interest on bonded debt, depreciation occasioned by obsolescence, property taxes, insurance and other irreducible overhead. Variable costs typically include such items as materials, fuel, labor, use-depreciation, royalties and license fees, and repair and maintenance. Average variable cost is the sum of all variable costs divided by the level of output. Marginal cost is the increase in variable cost that results from an extra unit of output.

Fixed and variable costs are considered backward-looking "accounting costs," because they are "determined using data generated by conventional accounting methods." *See id.* at 87. In other words, they can be

determined by looking at financial reports, such as a balance sheet. On the other hand, marginal cost "cannot be determined using data generated by conventional accounting methods." *Id.* Rather, marginal cost is determined by taking a forward-looking view of the firm, and has therefore been described as an "economist's construction." *Id.*

Another cost which cannot be determined by traditional accounting methods, but which is normally considered by a firm in making decisions regarding future activity, is the cost of capital. "The term "cost of capital" is widely used in the literature of investment decision-making and generally refers to the minimum rate of return which a firm requires as a condition for undertaking an investment." Victor Brudney & William W. Bratton, *Brudney and Chirelstein's Corporate Finance* 449 (4th Ed.1993). If the rate of return on a proposed investment exceeds this rate of return, then the investment should be accepted by the firm, and if the investment is accepted, the value of the firm increases. *See id.* Because determination of the rate of return of a proposed investment requires assessing the risk of the proposed investment, *see* Comanor Aff. ¶ 21, determining the cost of capital requires assessing the risk of the proposed investment. Thus, while cost of capital is a tool with which a manager can measure the wisdom of a proposed investment, the tool, and the projected possible outcomes of the proposed investment, are all matters of art, not science.

■■■ The Second Circuit has held, following the test set forth by Philip Areeda & Donald F. Turner, *see* Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697, 716–18 & 733 (1975), that the appropriate measure of cost in a predatory pricing case is average variable cost. *See Northeastern Tel.,* 651 F.2d at 88 (2d Cir.1981). Thus, when a seller prices below reasonably anticipated average variable cost predatory pricing is presumed, *see Irvin Indus., Inc. v. Goodyear Aerospace Corp.,* 974 F.2d 241, 245 (2d Cir.1992) (citing Areeda & Turner), and prices above average variable cost are presumed non-predatory. *See Northeastern Tel.,* 651 F.2d at 88.

■■■ Application of the *Northeastern Telephone* rule is fairly straightforward in a typical predatory pricing case. However, the facts of this case allow AD/SAT to make an argument which purports to follow the rule, yet circumvents it. AP is a new entrant into the newspaper advertising delivery business. Both AD/SAT and AP agree that the appropriate time from which to calculate the costs of the AdSEND program is when it was presented to the AP Board for approval. Because variable costs, by definition, are those avoidable costs incurred as a result of an increase in output, where a new business is being considered all costs are avoidable and therefore variable. Thus, all costs associated with AdSEND are variable because the AP Board could have decided not to pursue the program at all and thereby avoided all of AdSEND's costs. *See* Deposition of Almarin Phillips at 80, 81, 83, 89–91, 184–86, 190. From the universal premise that "all costs are variable," AD/SAT argues that AP's *cost* of capital with respect to AdSEND is a variable cost, and therefore, following *Northeastern Telephone,* should be considered in determining whether or not the program is predatorily priced. From this, AD/SAT concludes that the AdSEND program is predatorily priced if AP's projected internal rate of return for the investment is lower than its projected cost of capital.

AD/SAT's conclusion is inconsistent with the reasoning offered by the *Northeastern Telephone* Court to support its conclusion that the appropriate measure of cost in a predatory pricing case is average variable cost. In reaching this conclusion, the *Northeastern Telephone* Court acknowledged, following Areeda & Turner, that "the relationship between a firm's prices and its marginal costs provides the best single determinant of predatory pricing." *Northeastern Tel.,* 651 F.2d at 88. The Court, however, refused to apply marginal cost. Again following Areeda & Turner, the Court reasoned that because it cannot be determined from conventional accounting methods, *see id.,* application of marginal cost to predatory pricing claims would produce administrative difficulties for courts.

By refusing to apply the best determinant of predatory pricing due to its difficulty of application, the *Northeastern Telephone* Court took a cautious approach to predatory pricing schemes which is consistent with the Supreme Court's approach. It must be remembered that the antitrust laws are designed to protect competition, not competitors. *See Brown Shoe,* 370 U.S. at 320, 82 S.Ct. at 1521. Under normal circumstances, the lowering of prices stimulates competition. Because " 'the mechanism by which a firm engages in predatory pricing,' " is also lowering prices, a mistaken inference of predatory pricing is extremely costly because it " ' "chill[s] the very conduct the antitrust laws are designed to protect." ' " *Brooke Group,* 509 U.S. at 226, 113 S.Ct. at 2590 (quoting *Cargill,* 479 U.S. at 122 n. 17, 107 S.Ct. at 495 n. 17 (quoting *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1359–60)). Taking a cautious approach is an especially appropriate response to the instant theory of predatory pricing offered by AD/SAT. By asking the Court to consider cost of capital in determining predatory pricing, AD/SAT is asking the Court to evaluate the risks associated with, and the value of, AP's AdSEND venture. Because determining the risk of an investment requires sophisticated business judgment, the exercise of which still cannot afford a certain answer, such activity by this Court could indeed " ' "chill the very conduct the antitrust laws are designed to protect." ' " *Id.* In short, a firm's use of cost of capital is a means of measuring the wisdom of an investment, and the Court declines the invitation to review the wisdom of AP's decision to launch AdSEND.

Even if the Court were to agree with AD/SAT that cost of capital should be considered in determining whether AdSEND is predatorily priced, a reasonable jury still could not find AP liable for predatory pricing. A successful predatory pricing claim requires a plaintiff to demonstrate that a defendant "had a dangerous probability of recouping its investment in below-cost pricing." *Brooke Group,* 509 U.S. at 224, 113 S.Ct. at 2588. For recoupment to occur, the below cost pricing must be able to drive competitors from the market, *see id.* at 225, 113 S.Ct. at 2589, allowing the offender to obtain enough market power to sustain "[monopoly] prices long enough to earn in excess profits what they earlier gave up in below-cost prices." *Matsushita,* 475 U.S. at 590–91, 106 S.Ct. at 1358. Determining the likelihood of recoupment of predatory losses requires, among other considerations, "a close analysis of ... the structure and conditions of the relevant market." *See Brooke Group,* 509 U.S. at 225, 113 S.Ct. at 2589. If such analysis reveals a market which is "highly diffuse and competitive, or where new entry is easy," *see id.,* then a reasonable jury could not conclude that the alleged scheme would maintain monopoly pricing for a sustained period of time because monopoly pricing is only possible with monopoly power. *See id.* Indeed, if competitors of the business pricing below cost are not driven out of the market, then the "predatory pricing produces lower aggregate prices in the market", and "the unsuccessful predation is in general a boon to consumers." *Id.* at 224, 113 S.Ct. at 2588.

Because the relevant market in this case is the delivery of advertising to newspapers by any means, the Court finds that even if the AdSEND program is predatorily priced, AP would be unable to recoup its losses. The market in this case is highly competitive. It is extremely unlikely that AP could predatorily price AdSEND and drive competitors out of the market, thus allowing AP to price AdSEND at monopoly prices. Even if that occurred, no reasonable juror could find that AP could sustain monopoly power long enough to recoup its losses. As noted above, the business of the overnight carriers is not limited to the delivery newspaper advertisements. Thus, an AP predatory pricing scheme would not drive them entirely out of business, meaning that reentry by the overnight carriers would be easy and quick if AP began to charge monopoly prices. Again to repeat, the barriers of entry into this market are low, which provides further evidence that AP's predatory pricing scheme could not succeed, as monopoly prices would result in new competitors entering the market. In short, considerations of the relevant market in this case mandate summary disposition of AD/

SAT's predatory pricing claim. *See Brooke Group*, 509 U.S. at 225, 113 S.Ct. at 2589.[14]

In summary, because cost of capital should not be considered in determining whether AP has priced below average variable cost, AD/SAT cannot show that the AdSEND program was predatorily priced. In addition, even if predatorily priced, because the relevant market is the delivery of advertisements by any means, AD/SAT cannot show a dangerous probability of recoupment.

### III. *AD/SAT's Section 2 Monopoly Leveraging Claim*

■ In its First Amended Complaint, AD/SAT alleges that AP leveraged its monopoly power in the wire services news transmission market and the wire services photo transmission market to unlawfully gain a competitive advantage in the electronic delivery of newspaper advertising submarket. *See* First Amended Complaint ¶ 32.[15] AP assumed for the purposes of this motion that it has monopolies in the wire services news and photo markets.

■ The Second Circuit first recognized a separate § 2 claim for monopoly leveraging in *Berkey Photo*, 603 F.2d at 274.

"Monopoly leveraging is where a party uses its monopoly power in one market to distort or affect competition in another market." *Ortho Diagnostic Sys., Inc. v. Abbott Lab., Inc.*, 822 F.Supp. 145, 153 (S.D.N.Y.1993); *see Twin Lab.*, 900 F.2d at 571. A defendant need not monopolize or even attempt to monopolize the second market to be liable for monopoly leveraging. *See Virgin Atl. Airways, Ltd. v. British Airways, PLC*, 872 F.Supp. 52, 65 (S.D.N.Y.1994).[16] However, there must be a "tangible harm to competition" in the second market. *Twin Lab.*, 900 F.2d at 571; *see Berkey Photo*, 603 F.2d at 276 (citing *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 608–09, 73 S.Ct. 872, 880–81, 97 L.Ed. 1277 (1953)) (substantial amount of competition in second market must be foreclosed).

■ Dicta in the *Twin Lab.* case called into question the applicability of a *Berkey Photo* monopoly leveraging claim in a case which does not involve a tying allegation. *See also Soap Opera Now, Inc. v. Network Pub. Corp.*, 737 F.Supp. 1338, 1344 (S.D.N.Y. 1990) (citing *Twin Lab.* for the stated proposition). In antitrust law, a "tying" claim

14. The Court notes in passing that AP contends that, even if cost of capital is considered, AdSEND is not priced below cost. Dr. Comanor concluded that AdSEND was priced below cost upon finding that the program's cost of capital, between 19% and 24%, was higher than its projected internal rate of return ("IRR") of 16.5%. However, in determining the IRR, Dr. Comanor presumed that after a five year period the AdSEND program would have "no residual value remaining." *See* Comanor Aff. ¶ 12. In so doing, he followed the five-year planning period developed in AP's business plan. *See* PX 211. However, "[m]ost, if not all, finance textbooks ... state that a continuing value should be included in the calculation of IRR's." Phillips Aff. ¶ 7 (citing Brealey & Myers, *Principles of Corporate Finance* 96 4th ed. (1991) and Copeland et al., *Valuation: Measuring and Managing the Value of Companies* 207 (1990)). Because the issue is not clear, the Court will not resolve whether Dr. Comanor or Dr. Phillips is correct. However, assuming Dr. Comanor is correct, meaning that AdSEND is priced below cost, the Court notes that his conclusion depends upon AdSEND having no value in five years. Given this, the Court views with even more skepticism AD/SAT's assertion that there is a dangerous probability that AP could recoup the losses it suffered in predatorily pricing AdSEND.

15. In its First Amended Complaint AD/SAT also alleges that AP leveraged its monopoly power in the satellite transmission newspaper services market to gain advantage in the electronic delivery of advertisements market. *See id.* However, in its memorandum of law in opposition to summary judgment, this allegation is not discussed. *See* Pl's. Opp. at 59–62. Therefore, the Court deems it waived.

16. It has been suggested by academic commentators that, after the Supreme Court decisions in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), and *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), monopolization or a dangerous threat of monopolization of the second market is necessary for a monopoly leveraging claim to succeed. *See International Audiotext Network v. American Tel. & Tel. Co.*, 893 F.Supp. 1207, 1212 n. 4 (S.D.N.Y.1994) (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 626.1 (Supp.1993)). However, the District Courts of the Second Circuit continue to follow *Berkey Photo*.

involves the tying of the sale of one product or service to the sale of another product or service for which the seller has a monopoly. For example, in *International Salt Co., Inc. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), the seller had patents on two machines for utilization of salt products. Because these patents created a limited monopoly, leases which required purchasers to buy the seller's salt as well as his machines were declared an unlawful restraint of trade in violation of § 1 of the Sherman Act because competition in the relevant salt market was foreclosed. *See id.* at 395–96, 68 S.Ct. at 14–15. The instant case does not involve "tying" because there is no evidence that AP is conditioning any of its other services on the use of AdSEND. Following the suggestion by the Second Circuit in *Twin Lab.*, the Court views with skepticism AD/SAT's monopoly leveraging claim.

■ The evidence supplied by AD/SAT to support its claim does not convince the Court that its skepticism is unwarranted. The *Berkey Photo* Court emphasized that a firm "does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market." *Berkey Photo*, 603 F.2d at 276. AD/SAT's purported evidence of monopoly leveraging indicates that any benefits AP may have in the advertising delivery business are lawful. Of the seven examples of leveraging listed by AD/SAT on page 61 of its memorandum in opposition to summary judgment, numbers one, three, four, and five will be discussed here.[17] AD/SAT's first example of leveraging is that AP subsidized the cost of advertisement reception equipment, for which it does not charge newspapers, through member-owner assessments. There is simply no proof that this happened. Moreover, AP asserts that it keeps title to the equipment, and merely allows papers to use it in order to join the AdSEND network. Therefore, this assertion cannot support a monopoly leveraging claim. As a third example, AD/SAT states that AP leveraged off its preexisting satellite network to convince advertisers that it could offer access to all United States newspapers. As a fourth example, AD/SAT states that AP used its bureau chiefs and news and photo personnel to solicit advertisers and newspapers for AdSEND. None of these examples can sustain a monopoly leveraging claim because they do not turn on AP's being a monopoly in the original markets.[18] Indeed, this is simply normal business development which is to be expected by any competitor entering a new

17. For a discussion of numbers two and six, which are based on conspiracy allegations, *see infra* part V. For a discussion of number seven, which deals with the allegedly premature announcement of AdSEND, *see supra* part II.B.1.

18. Although not presented as such, the Court interprets AD/SAT's claim that AP is charging it monopoly prices for the use and maintenance of the AP owned satellite system as also one for monopoly leveraging. This conclusion follows from AD/SAT's argument that in order to compete in the electronic ad delivery market a business "must either gain access to the network, for which AP is charging monopoly prices when it allows access at all, or incur substantial expense to create duplicate facilities, which will then be used to solicit the business of the very newspapers that own the AP satellite network." Pl.'s.Opp. at 81–82. AP charges AD/SAT $730,-000 annually for the use of its satellite, while charging itself $75,000. AD/SAT's argument fails for several reasons. First, AD/SAT provides no evidence that AP has a monopoly in the satellite market. Therefore, because the exercise of monopoly power is necessary to sustain a monopoly leveraging claim, *see Berkey Photo*, 603 F.2d at 284, AD/SAT's must fail. Second, AP is providing access to its satellite system. While AD/SAT claims that access is afforded only by paying monopoly prices, the Court notes that the contracts governing this relationship between AD/SAT and AP were first entered into in 1986, and were favorably renegotiated by AD/SAT in 1991. Thus, absent evidence of an actual monopoly in the satellite market, the Court assumes that the price AP charges AD/SAT for use of its satellite network is the market rate. Finally, even if the prices AP charges AD/SAT to use its satellite network were the exercise of monopoly power, because the relevant market in this case is the delivery of newspaper advertisements by any means, AD/SAT's monopoly leveraging claims still must fail. It is simply not necessary either to gain access to AP's network, or to build duplicate facilities, in order to compete in this market. *See Ortho Diagnostic*, 822 F.Supp. at 153 ("[m]onopoly leveraging is where a party uses its monopoly power in one market to distort or affect competition *in another market*.") (emphasis added).

business. AP may be taking advantage of its resources and its good will, but doing so does not violate the antitrust laws.

AD/SAT also alleges that AP unlawfully leveraged off its monopolies by reminding its members that using AdSEND would be good for them because they are member owners. First, the Court notes that AD/SAT offers no support to defend this claim. To the extent that this claim collapses with AD/SAT's conspiracy allegations, it will be discussed below. *See infra* part V.A. Again, however, it should be clear that this conduct is not an exertion of monopoly influence because it does not turn on AP having a monopoly in either the news or photo markets. In addition, it does not affect competition in the electronic delivery of advertisement market. Therefore, the Court grants AP's motion for summary judgment as to AD/SAT's monopoly leveraging claim.

## IV. *Unlawful Monopolization of the News and Photo Markets*

▆▆ AD/SAT also asserts a § 2 unlawful monopolization claim. A claim for unlawful monopolization has two elements: " '(1) the possession of monopoly power in the relevant market and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Ortho Diagnostic*, 822 F.Supp. at 153 (quoting *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04).

▆▆▆ In this case, AD/SAT argues that AP's entry into the advertising delivery market was a "defensive strategy" employed to prevent others, including AD/SAT, from entering the news and photo markets, thereby protecting AP's existing monopolies in those markets. AD/SAT finds justification for its argument from internal AP documents, which include statements like the following: "Once someone else has built a network for digital delivery of advertising, they will have in place the infrastructure to deliver anything else." PX 36 (internal memorandum from AP vice president John Reid to AP president Lou Boccardi).

The Court first notes that this claim was not pleaded in AD/SAT's First Amended Complaint. AP only conceded that it had monopoly power in the news and photo markets for the purposes of this motion. It is improper for AD/SAT to attempt to prove an essential element of a claim not in its complaint by way of this concession.

Regardless, the monopolization claim must fail because AD/SAT lacks standing to assert it. The right of private parties to file claims under the federal antitrust laws derives from two sections of the Clayton Act. 15 U.S.C. § 12 *et seq.* Section 4 of the Clayton Act provides in relevant part that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court in the United States ... and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. In relevant part, section 16 of the Clayton Act states that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. A literal reading of these sections would provide a remedy to "any person" who has suffered an injury-in-fact from an antitrust violation. However, one step courts have taken to narrow the class of plaintiffs who may bring private antitrust actions is to require a showing of antitrust injury as a necessary, but not sufficient, condition of antitrust standing. *See Cargill*, 479 U.S. at 111, 107 S.Ct. at 489–90. Because an antitrust injury must be of the type which the antitrust laws were intended to prevent, *see id.* at 109, 107 S.Ct. at 488–89; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977), an injury to competition is required. *See id.* at 488, 97 S.Ct. at 697. Once an injury to competition is established, the Supreme Court has limited who may sue to remedy that injury. According to the Court in *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters, et al.*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the "Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of [competitors] in the

relevant market." *Id.* at 538, 103 S.Ct. at 908.

Under the *Associated General* rule, AP can only cause antitrust injury to AD/SAT through activity in a market in which AD/SAT is either a customer or a competitor. Therefore, because AD/SAT is admittedly neither a customer nor a competitor in either the news or photo markets, it lacks standing to sue AP for monopolization of the news and photo markets. Hence, its monopolization claim must fail. AD/SAT attempts to avoid this conclusion by theorizing that AP is protecting its monopolies in those markets through its anticompetitive activities in a market in which AD/SAT does compete, the ad delivery market. However, if anticompetitive activity by AP, and antitrust injury to AD/SAT, is occurring in the ad delivery market, then the appropriate response by AD/SAT are claims against AP for monopoly and attempted monopoly of this market. In fact, AD/SAT has made the latter claim and cannot make the former. AD/SAT lacks standing to bring this monopolization claim, and therefore summary judgment is granted to AP.

## V. *The Sherman Act Conspiracy Claims*

Before addressing whether or not the defendants entered any unlawful agreements to refuse to deal or boycott AD/SAT under § 1 of the Sherman Act, or to monopolize the relevant market under § 2 of the Sherman Act, the Court will address two related, threshold arguments advanced by AD/SAT to support its claim of conspiracy.

■■■ The two threshold arguments center around the claim that simply by developing and implementing the AdSEND program, AP is necessarily engaging in concerted action within the meaning of the Sherman Act.[19] First, AD/SAT's asserts that the Supreme Court's decision in *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), has collateral estoppel effect on any arguments defendants may make to establish that AD/SAT has not proven a conspiracy in this case. In *Associated Press,*

the Supreme Court found that two AP by-laws, which had the effect of preventing all newspapers who were not AP members from buying news from AP or any of its members, and therefore restrained competition in the newspaper publishing field, violated §§ 1 and 2 of the Sherman Act. The Court held that "arrangements or combinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose." *Id.* at 19, 65 S.Ct. at 1424.

■■■ Under the doctrine of collateral estoppel, which is also known as issue preclusion, " ' "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." ' " *Remington Rand Corp. v. Amsterdam–Rotterdam Bank,* 68 F.3d 1478, 1485 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980))). In this case, an AP by-law is not at issue. Moreover, this case involves an alleged conspiracy surrounding the electronic transmission of advertising. The 1945 *Associated Press* case does not preclude litigation of whether such a conspiracy exists. Therefore, collateral estoppel does not serve as a bar to defendants in this case.

■■■ As a second argument, AD/SAT asserts that, even if the *Associated Press* decision does not preclude litigation of the conspiracy issue in this case, decisions holding that "conduct of an association adversely affecting competitors is joint action by the association's members," *see* Pl's.Opp. at 46–47, compel this Court, without reviewing the evidence, to find a conspiracy in this case. The argument does not persuade. While it is true that AD/SAT cites several cases contain dicta which states that associations are inherently conspiratorial, careful review of these cases reveals that they are distinguishable from the instant situation. All of the cases AD/SAT relies upon involve situations where an association is regulating the conduct of its

---

**19.** Assuming this argument succeeds, AD/SAT asserts that the liability of NAA and the newspaper defendant turns upon whether they participated

in or ratified the AdSEND program. *See* Pl's.Opp. at 52.

members, through an explicit agreement (i.e. a by-law or some other formal action), as to an area of activity in which the members are in competition. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 496–97, 108 S.Ct. 1931, 1934–35, 100 L.Ed.2d 497 (1988); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 601–02, 92 S.Ct. 1126, 1130–31, 31 L.Ed.2d 515 (1972) (by-laws effectively limit competition by allocating geographic territories among members); *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457, 462–63, 61 S.Ct. 703, 705–06, 85 L.Ed. 949 (1941) (rules and policies of Guild anti-competitive); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1384 (9th Cir.) (Article of NFL Constitution precluding franchise from locating within 75 miles of another franchise without consent of that franchise anti-competitive), *cert. denied sub nom. Oakland–Alameda County Coliseum, Inc. v. Oakland Raiders, Ltd.*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). This case does not involve the regulation by an association of an area of activity in which its members are in competition. Rather, it involves AP supplying a service, the electronic delivery of advertisements, to its members. Therefore, the Court finds the decisions of this and other Circuit Courts holding that associations are not "walking conspiracies," *Consolidated Metal Prods., Inc. v. American Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir.1988), persuasive. *See Wilk v. American Medical Ass'n*, 895 F.2d 352, 374 (7th Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 524 (1990) (trade association, even when setting industry standards, not by definition a "walking conspiracy"); *see also Capital Imaging*, 996 F.2d at 544 (2d Cir.1993) (in case involving conduct of a trade association, court searched for agreement among association's members). Because the *Associated Press* case does not have collateral es-

toppel effect, and because associations such as AP are not by definition antitrust conspiracies, AD/SAT must establish a conspiracy in this case by proving the existence of an agreement.

## A. Sherman Act § 1 Conspiracy

Section 1 of the Sherman Act, 15 U.S.C. § 1, forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." A threshold determination a court must make on a motion for summary judgment in a § 1 case is whether or not a reasonable jury could find that there was some form of concerted action between two or more legally distinct economic entities. *See Capital Imaging*, 996 F.2d at 542. Only after an illegal agreement is shown will a court consider whether the agreement constituted an unreasonable restraint of trade, whether *per se* or under the rule of reason. *See id.*[20]

In *Monsanto Co. v. Spray–Rite Serv. Co.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) the Supreme Court held that to permit the inference of concerted action, a plaintiff must present direct or circumstantial evidence which reasonably tends to prove that each defendant " 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980)), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). According to AD/SAT, in this case the "common scheme" to which all defendants have "consciously" agreed is a refusal to deal with AD/SAT. In deciding whether a defendant was a member of an unlawful conspiracy, its refusal to deal cannot be viewed in isolation, but must be viewed in its factual context. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (discussing *First Nat'l Bank of Ariz. v.*

**20.** Typically, § 1 cases are analyzed under the rule of reason, which requires the factfinder "to weigh all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). In a limited number of cases, conduct which is so plainly harmful to

competition will be declared *per se* illegal. *See id.* at 49–50, 97 S.Ct. at 2557–58. Examples of *per se* illegality include horizontal and vertical price fixing, the division of a market into territories, certain tying arrangements, and some group boycotts involving concerted refusals to deal with a competitor. *See Capital Imaging*, 996 F.2d at 542–43 (citing cases).

*Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). The practical obstacles to implementing the conspiracy is part of the factual context. *See id.* at 588, 106 S.Ct. at 1356–57. Absent an express agreement, if the factual context indicates that a defendant lacked a rational motivation to join the alleged boycott, then summary judgment is appropriate. *See id.; Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.) ("a conspiracy must be proved by strong direct or strong circumstantial evidence, and the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence."), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *see also Eastman Kodak*, 504 U.S. at 468–69, 112 S.Ct. at 2082–83 (applying *Matsushita* rule that summary judgment appropriate if theories make no economic sense to non-conspiracy antitrust claims). Even if there is a motivation to conspire, if the refusal to deal is consistent with a defendant's independent economic interest, more must be shown by the plaintiff to survive a summary judgment motion. A plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356 (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470–71); *see Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 70 (2d Cir.1988) (section 1 does not prohibit independent business actions and decisions); *AD/SAT, a division of Skylight, Inc. v. Associated Press*, 885 F.Supp. 511, 519 (S.D.N.Y.1995). Evidence of conduct that is as consistent with permissible conduct as with illegal conspiracy (i.e. "parallel conduct") is insufficient. *See Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356–57; *Apex Oil*, 822 F.2d at 252.

The Court finds that none of the defendants had a rational motivation to join the alleged conspiracy.[21] In addition, all defendants had valid independent reasons for making the decisions they did. However, because the motivations for and explanations of the actions taken by the newspaper defendants are different from, although related to, NAA and NNN, the Court will first discuss AD/SAT's claims as applied to the newspaper defendants, and then as applied to the NAA and the NNN. Finally, the Court will discuss AD/SAT's claims against Donald Newhouse and Advance.

### 1. The Newspaper Defendants

According to AD/SAT, the newspapers joined AP in a concerted refusal to deal with AD/SAT in order to drive it out of business. The refusal to deal, AD/SAT argues, would reduce competition in the electronic delivery of advertising market, which would provide AdSEND with a competitive advantage.[22] Finally, the profits AP earned by way of this competitive advantage would benefit the newspapers by allowing AP to reduce each paper's annual AP membership dues.

The Court finds three problems with this theory. First, the practical barriers to the conspiracy succeeding in its anticompetitive goals destroys any rational reason a newspaper might have to participate. At the time of the filing of this motion, 48 of the 50 largest newspapers by circulation were AD/SAT affiliates. In addition, 60 of the next 100 largest papers were also affiliates. To reach its purported goal of reducing competition in the market, this alleged conspiracy would have to be able to disable AD/SAT's ability to compete. In order for this to happen, the larger

---

**21.** Because liability for conspiracy requires an agreement between at least two distinct economic entities, *see supra* p. 1308, the Court need not, and does not, separately review AP's conduct to see if it had a motive to conspire. That is, even if AP had a motivation to conspire, because the Court finds that no other defendant had a rational motivation to conspire, necessarily AP has no potential co-conspirators. Therefore, AP's conduct with respect to the conspiracy claims is only discussed as it relates to other defendants.

**22.** In fact, AD/SAT appears to state that the purpose of the illegal agreement is to create a monopoly for AdSEND so that AP can earn monopoly profits, and pass these profits to the papers by way of reducing membership dues. *See* Pl's.Opp. at 70. While a § 2 conspiracy does require monopolization of the market as a goal, because § 1 only requires an adverse effect on competition, *see Capital Imaging*, 996 F.2d at 543, the Court assumes AD/SAT's theory, as applied to its § 1 claim, is so limited.

circulation papers would have to join the conspiracy. However, because AD/SAT's service is more cost effective for national advertisers sending a single ad to multiple newspapers, and because national ads supply a greater source of revenue to larger circulation newspapers, these larger papers have limited reason to boycott AD/SAT. Therefore, in light of the lack of incentive for larger papers to join the conspiracy, it would be irrational for the smaller market newspaper defendants in this case to join the conspiracy because it would be unlikely to produce the desired results.

Second, even if AD/SAT could be eliminated from the market, because the Court finds the relevant market in this case to be the delivery of advertisements by any means, it is extremely unlikely that competition would be affected in a measurable amount. Without such a reduction in competition, the newspaper's goal in joining the alleged agreement—reducing AP membership dues by way of anticompetitive pricing—could not be met. Therefore, there is no economic reason to join the alleged boycott.

Finally, and most important, even if this implausible scheme could succeed, the Court wonders how much joy it would bring the newspapers. As recognized by the Supreme Court over forty years ago, see *Times–Picayune*, 345 U.S. at 604, 73 S.Ct. at 878, and as is still true today, revenue from advertising is the primary source of income for newspapers. Therefore, it is in a newspaper's interest to make advertising in newspapers as attractive as possible to advertisers, who have various alternative media in which to advertise their products, including television, radio, and billboards. One way to make advertising in newspapers attractive to ad-

vertisers is to reduce the advertiser's costs. Typically, advertisers bear the costs associated with delivering ads to newspapers. In theory, in a free market economy, the cost of delivering ads decreases as competition in the delivery market increases. Therefore, while it makes sense for the papers to want AP's AdSEND to enter the delivery market because it increases competition, it does not make sense to exclude AD/SAT from the market.[23]

As demonstrated in the following paragraphs, even if the newspapers do have a motive to conspire, each newspaper defendant who terminated, or attempted to terminate, its AD/SAT affiliation agreement had independent business reasons for doing so. Because AD/SAT has offered no evidence which "tends to exclude the possibility" that these business reasons explain the defendants conduct, summary judgment is appropriate for all newspaper defendants.

### a. *Newark Morning Ledger Co.*

The *Star–Ledger*, which, in 1986, became the first AD/SAT affiliate, is published in Newark, New Jersey, within close proximity of the strong advertising base in New York City. Therefore, while still receiving ads from overnight couriers and electronic deliverers (including AD/SAT and AP AdSEND), the *Star–Ledger* is able to receive a great proportion of its ads by using several relatively inexpensive messenger services. *See* Declaration of Mark Herrick ("Herrick Decl.") ¶¶ 3–6, 7. While the prices paid for these services varies depending upon the service provider and the number of pick-ups, all are substantially less expensive for the *Star–Ledger* than receiving ads over the AD/SAT network.

---

23. AD/SAT criticized this Court's Opinion and Order granting summary judgment to the *Lexington Herald–Leader* because it failed to acknowledge evidence intended to prove that the papers believed it rational to help AP achieve a monopoly. Specifically, AD/SAT presented a statement apparently made by Jerry Tillis, a vice president of marketing for Knight–Ridder, that because current delivery services, including AD/SAT, were in disarray, there was a great opportunity for AP to enter the market, and by so doing it could mean a major offset in the AP dues structure. *See* PX 25. This evidence is not probative. First, it amounts to nothing more than encour-

agement for a new competitor to enter the ad delivery market, which is in the interest of all newspapers and is conduct the antitrust laws are designed to protect. It is true that AP papers may have a special interest in AP making a successful entry into the market. However, because papers survive based upon generating profits, not decreasing their AP membership dues, their overriding interest is in decreasing advertiser costs, which is effected through competition. In addition, the Court notes that this statement was not made by a defendant in this action, and is not therefore probative of any defendant's intention.

After receiving another invoice for the $7,500 AD/SAT annual affiliation fee in January 1993, Mark Herrick, the director of marketing and advertising at the *Star–Ledger,* decided not to pay the fee. Herrick states that he thought the fee was too expensive, and wanted to renegotiate with AD/SAT. *See* Newhouse Defendants' Rule 3(g) Reply ¶ 58. It is unclear what discussions, if any, occurred between the *Star–Ledger* and AD/SAT from January to August 1993. However, in a meeting with AD/SAT officials, including then-President Richard Atkins, Herrick stated that he believed AD/SAT's service was too expensive, and asked that the affiliation agreement be renegotiated, and the still-unpaid 1993 affiliation fee be waived. *See* Deposition of Mark Herrick at 19–20; Deposition of John C. Langstine at 420–21; PX 1043. In response, Atkins stated that AD/SAT intended not to eliminate but to increase the Star–Ledger's annual affiliation fee to $12,500. *See* PX 1043.

However, at the same meeting, Atkins introduced a discount group proposal for the Newhouse newspapers, which would allow all of the papers to become AD/SAT affiliates, and require each paper to pay an annual affiliation fee of $6,000, and a per ad transmission fee of $25. *See* PX 1042. Herrick stated that he did not have the authority to make such decisions, but would pass the proposal on to his superiors to get their response. The proposal was ultimately rejected.

No further discussion of the unpaid 1993 affiliation fee occurred until after current-president Hilton and the new owners of AD/SAT began to review old invoices and realized that neither the 1993 nor the 1994 affiliation agreements had been paid. After an exchange of letters regarding the affiliation fees between AD/SAT and the *Star–Ledger* during the summer of 1994, on August 19, 1994, Herrick sent written proposed amendments to the affiliation agreement to Hilton. The amendments proposed that the unpaid affiliation fees be forgiven, future affiliation fees be eliminated, and the notice period for termination be reduced from nine months to seven days. *See* DX 91. On December 28, 1994, after this lawsuit was filed, AD/SAT formally rejected the proposal and demanded payment of the unpaid affiliation fees, but also promised to provide their own proposal to the *Star–Ledger* in the near future. *See* DX 371. No proposal had been made at the time this motion was filed. The *Star–Ledger* eventually paid the affiliation fees, and presently remains an AD/SAT affiliate and receives ads over the network.

The only evidence AD/SAT supplies to support its claim that the *Star–Ledger* was a member of the alleged conspiracy is that Donald Newhouse, the president of Advance, which owns the *Star–Ledger,* knew about AP's plan to enter the ad delivery business several months before the August 1993 meeting between Herrick and the AD/SAT officers. This fact is offered to explain why the *Star–Ledger* refused to deal with AD/SAT and why the Newhouse papers rejected the group proposal offered by AD/SAT.[24]

For several reasons, the Court finds this argument insufficient to survive the *Star–Ledger*'s motion for summary judgment. First, it is not at all clear that the *Star–Ledger* refused to deal with AD/SAT. All of the evidence suggests that in refusing to pay the annual affiliation fee, Herrick was attempting, admittedly in an unorthodox fashion, to renegotiate the *Star–Ledger*'s agreement with AD/SAT. In light of the costs the paper was paying to use AD/SAT's service, attempting to renegotiate makes good business sense. While AD/SAT may believe that the requests made by the paper, including elimination of the affiliation fees and reduction of the notice of termination period to seven days, were unreasonable to the point of not constituting good faith negotiations, the Court notes that AdSEND is free to a paper, and the termination period is thirty days.

Even if these actions by Herrick did constitute a refusal to deal, considering the *Star–Ledger* had other, more cost-effective means of receiving ads, it had a valid business reason for ending its relationship with

---

24. For a discussion of whether or not the refusal to accept the group deal constitutes an unlawful restraint of trade, *see infra* part V.A.3.

**1312**

AD/SAT. The mere fact that Newhouse knew about AP's plans before the August 1993 meeting does not tend to exclude the possibility that Herrick's decision on behalf of the *Star–Ledger* was an independent one. There is no evidence that Newhouse and Herrick spoke about AdSEND before the meeting. Both deny that they had. Regardless, without evidence of what might have been said, a conspiracy cannot be built on sheer speculation. Therefore, summary judgment is granted to the *Star–Ledger.*

b. *The Birmingham News Company*

The *Birmingham News* entered into a five-year AD/SAT affiliation agreement on January 1, 1990. *See* AD/SAT Rule 3(g) Statement ¶ 193. The agreement required *The Birmingham News* to pay a $10,000 annual affiliation fee in addition to $25 for each national ad and $20 for each retail ad. *See id.* In the third or fourth week of May 1994, Tom Lager, the director of sales and Marketing at the paper, received an invoice for the annual $10,000 affiliation fee. Lager had previous experience with AD/SAT because the *Omaha World Herald* was an AD/SAT affiliate when he was its director of advertising. In that capacity, on December 6, 1991, Lager sent written notice of termination of affiliation to AD/SAT on behalf of the *Omaha World Herald. See* DX 308. That decision was made after Lager and others at the *Omaha World Herald* reviewed the volume of ads sent over the AD/SAT network, and found the service too costly. *See* Declaration of Thomas Lager ("Lager Decl.") ¶ 8.

After receiving *The Birmingham News*'s annual affiliation invoice in May 1994, Lager, who began working for the paper in January 1994, reviewed the paper's reception log, which recorded how many ads, and from what advertisers, were sent over the AD/SAT network. His review revealed that relatively few ads were being delivered over the network, and the majority were sent by a single advertiser. *See id.* ¶ 9. From this, Lager concluded that the paper's affiliation with AD/SAT did not make financial sense. While Lager did not make formal calculations at the time, later computation reveals that, considering reception fees and affilia-

tion fees, *The Birmingham News* was paying nearly $70 per ad sent over the AD/SAT network. *See* Newhouse Defendants' Rule 3(g) Statement ¶ 82. After his superior, Victor Hanson III, accepted his recommendation that the paper not renew its affiliation agreement, on June 6, 1994, Lager sent written notice of termination to AD/SAT. *See* DX 373. Lager concedes that before he sent the termination letter he had seen documents which discussed AdSEND, but states that they did not enter into his decision regarding AD/SAT. *See* Lager Decl. ¶ 24.

AD/SAT asks this Court to infer that *The Birmingham News* was part of the alleged conspiracy based upon: (1) a statement from Christopher D. Wood, AD/SAT's vice president of technical operations, that, after unplugging AD/SAT's service, the paper later reconnected the service to receive two "rush" ads it could not have otherwise received; (2) the paper's termination of its affiliation after the announcement of AdSEND; (3) the paper's ownership by Donald Newhouse; and (4) a letter to Victor Hanson from Publicitas, NAA's one order/one bill clearing agent.

Even assuming Wood's statement is true, while it might go to show that the decision to terminate AD/SAT was not a display of perfect business judgment, it certainly does not, as the antitrust conspiracy laws require, tend to exclude the possibility that Lager decided to terminate the AD/SAT affiliation because ads sent over the network were costing the paper nearly $70 an ad. Termination of the affiliation agreement after the announcement of AdSEND also fails to meet the *Monsanto* test of tending to exclude independent conduct because it shows, at best, parallel conduct after an invitation to conspire. As noted in the discussion concerning the *Star–Ledger,* the mere fact that *The Birmingham News* is a Newhouse newspaper does not tend to exclude the possibility that the decision to terminate was an independent business decision. Finally, the letter from Publicitas CEO Bill Howard to Hanson, which followed up on a conversation between the two, would not allow a reasonable juror to infer a conspiracy because the letter explicitly states that Publicitas's working with the paper was not contingent upon the paper's

use of AdSEND. *See* PX 473. The Court grants *The Birmingham News*'s motion for summary judgment.

### c. *The Cox Defendants*

Of the over fifteen newspapers owned by either defendant CEI or its subsidiary Cox Newspapers, only *four* ever entered affiliation agreements with AD/SAT. These are the *Dayton Daily News* (owned by defendant DNI), *The Atlanta Journal/Constitution* ("AJC"), *The Palm Beach Post*, and the *Austin–American Statesman*. The AJC and *The Palm Beach Post* remain AD/SAT affiliates, and are also experimenting with Ad-SEND. AD/SAT concedes that the *Austin–American Statesman*'s decision to terminate its affiliation was not the product of any conspiracy. *See* Deposition of Christopher D. Wood at 733. Prior to cancelling its affiliation agreement, the *Dayton Daily News* paid AD/SAT an annual affiliation fee of $7,500 plus reception fees of $20 to $25 per advertising transmission. The paper is now receiving electronically transmitted ads from both Ad express and AdSEND.

AD/SAT offers the following as evidence to implicate CEI and the *Dayton Daily News* into the alleged conspiracy: (1) the president of Cox, David Easterly, was a member of the *ad hoc* committee overseeing the AdSEND program; (2) on June 16, 1994, AP officers met with Cox advertising executives, and at the conclusion of the meeting, Cathleen Coffey of Cox directed the Cox Newspapers affiliated with AD/SAT to "review their contracts."; (3) the *Dayton Daily News* gave its notice of intent to cancel its AD/SAT affiliation agreement on August 3, 1994; and (4) notes written by AD/SAT president David Hilton, after a conversation with *Dayton Daily News* advertising director Pat Keil, that the paper's decision to use AdSEND was a "corporate one," meaning that it was made not at a local level, but by higher officers within CEI or Cox.

The *Dayton Daily News* submits that its decision to terminate AD/SAT was made locally by Keil for legitimate business reasons. For several reasons, the Court is persuaded by this explanation. First, Keil submits that she made her decision to terminate the agreement before the June 16 meeting, which she did not attend. Second, while it may be that the decision to use AdSEND was a "corporate" one, the evidence does not support an inference from this fact that there was also a corporate decision to boycott AD/SAT. Of the only four Cox papers who were ever solicited by AD/SAT to become affiliates, two continue to use AD/SAT, and the third terminated long before the alleged conspiracy began for legitimate business reasons. The Court finds that AD/SAT presented no evidence tending to exclude the possibility that the *Dayton Daily News*'s decision to terminate its AD/SAT affiliation was not independent action. Therefore, the Court grants summary judgment as to AD/SAT's § 1 claims against the DNI and CEI.

### d. *News & Observer Publishing Company*

The *News & Observer*, which entered its AD/SAT affiliation agreement on August 15, 1986, decided to temporarily unplug its AD/SAT recorder in February 1993, due to renovations at the paper which caused space limitations. *See* Affidavit of Richard Lee Henderson ("Henderson Aff.") ¶ 4. Richard Lee Henderson, the vice president in charge of sales and marketing at the *News & Observer*, noticed that he received no complaints from advertisers that the paper had disconnected AD/SAT's service. *See id.* ¶¶ 5–6. In the fall of 1993, Henderson learned that AD/SAT's corporate parent was filing for bankruptcy. Believing this to be valid grounds for termination of the agreement, a decision was made by Henderson, advertising director James McClure, and W.L. "Mack" McCormick, the local sales manager, to terminate the agreement. This decision was communicated to AD/SAT by a letter from McCormick, dated November 23, 1993. *See* PX 926. AD/SAT's Atkins believed that the bankruptcy was insufficient grounds for termination. Because McCormick and the others from the *News & Observer* disagreed, on January 20, 1994, McCormick wrote AD/SAT again and reconfirmed the paper's intention to exercise its right to terminate. *See* PX 929. This letter was written five days after Lawrence Blasko of AP visited the paper and introduced AdSEND. *See* PX 65. However, because AD/SAT, through its lawyers, continued to con-

test the *News & Observer's* right to terminate, the paper, after consulting with its lawyers, decided it would be cheaper to pay the $7500 affiliation fee rather than engage in a legal battle. *See* Henderson Aff. ¶ 11. Upon AD/SAT's insistence that the agreement so required, the recorder was re-installed at the paper. *See id.* at ¶ 14.

AD/SAT's attempt to implicate the *News & Observer* in its conspiracy relies on the following: (1) the paper's president, Frank Daniels, Jr., was Chairman of the Board of AP during the development, approval, and implementation of AdSEND; (2) five days after Blasko's visit, the paper re-confirmed its decision to terminate its relationship with AD/SAT; and (3) a conversation between an AD/SAT president Hilton and Daniels on June 15, 1994, during which Daniels allegedly said "I don't think we'll be doing business together, we're a beta [test] site for AdSEND."

The evidence shows that the *News & Observer*, because it was unsatisfied with AD/SAT's service, expressed its intent to terminate its affiliation agreement well before anyone from the paper had heard of AdSEND. AD/SAT presents no evidence to support an inference that Daniels was involved in, or even knew about, the decision to terminate, which was made in 1993, long before the June 15, 1994 phone conversation. A paper's decision to terminate a service which was both costing it money and not bringing in revenue, coupled with another decision to install an alternative service for free, are examples of independent conduct undertaken for valid business reasons. AD/SAT has supplied no evidence tending to exclude this possibility. Therefore, the Court grants summary judgment as to AD/SAT's § 1 conspiracy claim against the *News & Observer*.

e. *The Oklahoma Publishing Company*

The *Daily Oklahoman* sent AD/SAT a written notice of termination on November 1, 1993. *See* Affidavit of David L. Thompson ("Thompson Aff.") ¶ 7, Ex. B.[25] In 1993, the *Daily Oklahoman* received 154 ads over the AD/SAT system. *See id.* ¶ 4. Considering the per transmission fee and the affiliation

fee, this cost the paper approximately $67 per ad. *See id.* There is no evidence that David L. Thompson, the advertising director at the *Daily Oklahoman*, had even heard of the AdSEND program until several weeks after its formal announcement on April 25, 1994. *See id.* ¶ 11.

The facts which AD/SAT attempts to rest its conspiracy claim against the *Daily Oklahoman* are very weak. First, AD/SAT shows that the paper, in the summer and fall of 1994, informed some of its larger advertisers that it had both terminated its relationship with AD/SAT and installed AP's AdSEND. *See* PX 1182, 1186. Also, AD/SAT asserts that the failure to renegotiate with AD/SAT is evidence of the *Daily Oklahoman*'s involvement in the conspiracy. Finally, AD/SAT reports that an employee of the paper stated to an AD/SAT executive that she would "rather stay on the AD/SAT network because of the speed of the service." PX 1183.

None of these facts would allow a reasonable juror to conclude that the *Daily Oklahoman* was a member of a conspiracy to boycott AD/SAT. The antitrust laws do not condemn a newspaper for informing its advertisers that it is terminating its relationship with its delivery service due to probative costs, and then subsequently informing the advertisers about alternative sources of delivery. Nor is the alleged statement of one newspaper employee sufficient to support an inference of conspiracy. There is no evidence that this employee was involved in the decision to end the AD/SAT affiliation. Assuming the statement was made and was true, the mere fact that the employee liked the service does not support an inference of participation in a concerted refusal to deal with the goal of driving AD/SAT out of business. Finally, a failure to reconsider an earlier decision to terminate the AD/SAT affiliation because of its cost is not evidence of conspiratorial conduct, especially when one considers that the offer to reconsider did not include a marked reduction in cost. The Court grants the *Daily Oklahoman*'s motion

**25.** AD/SAT first responded to the notice of termination in a letter dated September 28, 1994.

The letter asked the *Daily Oklahoman* to reconsider its decision. *See* PX 693.

for summary judgment as to AD/SAT § 1 claim against it.

### f. *The Oakland Press Company*

*The Oakland Press* signed an affiliation agreement with AD/SAT on October 15, 1993. *See* Declaration of Alfred Derusha ("Derusha Decl.") ¶ 5, Ex. A. The agreement, which requires AD/SAT to install the reception equipment, contained a provision allowing either party to terminate the agreement without penalty if the other side was in material default of any of its obligations under the agreement. In negotiating the agreement, then-AD/SAT president Atkins promised to install the equipment within 30 days. *See* Declaration of James W. Lowe ¶ 4, Ex. B. More than 30 days later, on October 20, 1993, Atkins wrote a letter to Alfred Derusha, the advertising director of *The Oakland Press,* which said that AD/SAT would "get to work right away on installation of the equipment." *Id.* ¶ 5, Ex. C. Because the equipment still had not been delivered and installed, on May 17, 1994, Derusha wrote Atkins a letter which said that because AD/SAT was in material default, the paper was terminating the affiliation agreement. *See id.* ¶ 6, Ex. D. AD/SAT's new president Hilton, responding by letter on May 20, argued that *The Oakland Press* had no right to terminate the agreement, and stated that the equipment was being delivered. *See id.* ¶ 8, Ex. F.

These facts would not allow a reasonable juror to find that *The Oakland Press* was a member of the alleged conspiracy to boycott. As with all newspaper defendants, *The Oakland Press* simply ended a relationship with an ad delivery service which charged it substantial fees, and replaced that service with one that was free. This certainly appears to be a legitimate, independent business decision. Moreover, AD/SAT's failure to install the reception equipment in a timely fashion is further evidence that *The Oakland Press* 's decision was an independent one.

AD/SAT attempts to support its § 1 conspiracy claim against the paper through the affidavit of Randall S. Winston, Esq., an attorney for AD/SAT at the relevant time. Winston stated that Robert G. Waddell, Esq., an attorney for *The Oakland Press,* told him two months after the affiliation agreement was terminated that the reason for the termination was so that the paper could participate in AP's program. *See* Affidavit of Randall S. Winston, Esq. ¶ 3. This evidence does not tend to exclude the possibility that *The Oakland Press* terminated its agreement as part of a concerted refusal to deal with AD/SAT. First, the statement is hearsay. Second, the statement does not provide evidence of a conspiracy to boycott AD/SAT, but simply acknowledges a decision to switch to a better service. Third, hand-written notes taken by Winston during his meeting with Waddell indicate that concern over the terms of the AD/SAT affiliation agreement, and not the presence of AP's AdSEND, was the reason for termination of the AD/SAT affiliation. *See* Supplemental Declaration of James W. Lowe, Esq. ¶¶ 4, 5, Ex. C, D. Fourth, it is undisputed that, even after its letter expressing a desire to terminate the original affiliation agreement, *The Oakland Press* remained interested in negotiating a new, more favorable, affiliation agreement with AD/SAT until the commencement of this lawsuit. *See id.* Ex. C; Derusha Decl. ¶¶ 14–16, 19. Finally, while *The Oakland Press* admits that it permitted AP to install AdSEND equipment in January 1995, eight months after termination of its AD/SAT affiliation, there is no evidence that an affiliation agreement with AP has been signed, or that any ads have been sent via AdSEND. *See id.* ¶ 18. Therefore, as to AD/SAT's § 1 claim against it, the Court grants summary judgment to *The Oakland Press.*

### 2. *NAA and NNN*

Unlike the newspapers, NAA and NNN are not direct participants in the ad delivery business. They do not create, deliver or receive ads. Therefore, unlike the newspapers, a decision to boycott AD/SAT is neither a decision to attempt to eliminate a supplier, nor a decision to threaten a relationship with a group (advertisers) upon which it financially depends by subjecting that group to an ad deliverer (AP AdSEND) which has an unfair competitive advantage. However, despite these differences, NAA and NNN have something in common with the

newspapers—they too lack a rational motivation to join the alleged conspiracy.

Considering that a central goal of NAA is to encourage technological development in the newspaper industry in order to increase the profitability of papers, and considering that NNN was created with the more specific goal of increasing the newspaper industry's declining share of advertising dollars, neither NAA nor NNN, so long as they are adhering to these goals, have a rational motivation to join the alleged conspiracy. It is counter to the goals of both organizations to work to eliminate one competitor in a market, while simultaneously supporting another which is nearly a year away from being operational, when competition would result in advertisers receiving the best service.

AD/SAT concedes that NAA, after an initial meeting with AP executives in August 1993, made it clear that, while it would cooperate with AP's effort to develop an electronic ad delivery system, it could not "exclude other groups from providing this service." PX 519; *see also* PX 28. However, AD/SAT alleges that, after meetings between top AP executives and NAA president Cathie Black and her staff, which were arranged by Donald Newhouse, NAA reversed its position and began to boycott AD/SAT.

There is ample evidence to show that NAA encouraged AP when AdSEND was in the development stage. *See* PX 21, 27, 28, 29, 46, 48, 61, 68, 104. In addition, after the announcement of AdSEND, NAA allowed AP to give brief presentations about AdSEND at NNN regional meetings. *See* PX 17, 254, 261.[26] However, AD/SAT must show that NAA and NNN participated in an anticompetitive refusal to deal with it. The evidence

indicates, however, that not only did NAA continue to promote other electronic deliverers beyond AP's AdSEND, *see* Affidavit of Patricia Farren, Esq. Ex. K, NAA 1–4, 510–11, but AD/SAT as well. *See* NAA and NNN Rule 3(g) Reply at 9.1, 9.5, 9.6, 9.8.

In sum, there is no evidence which shows that NAA and NNN were part of a conspiracy to boycott AD/SAT.[27] Summary judgment as to the § 1 conspiracy claims against NAA and NNN is granted.

### 3. *Donald Newhouse*

According to AD/SAT, Donald Newhouse sits at the center of the alleged conspiracy. As president and part owner of Advance, which owns 24 newspapers, including the *Star–Ledger* and *The Birmingham News*, a member of the AP Board, and the voluntary chairman of NAA during the time when AdSEND was developed, Newhouse certainly had ample opportunity to assist AP by conspiring with it to destroy competition. However, like the newspapers, NAA, and NNN, he did not have a rational motivation to do so. As both a newspaper owner and chairman of NAA, a primary interest for Newhouse is making newspaper advertising attractive to advertisers. Encouraging and assisting AP in its effort to enter the delivery market is certainly consistent with this interest. Joining a conspiracy to refuse to deal with AD/SAT in an effort to drive it out of business is not.

None of the evidence offered by AD/SAT implicates Newhouse in the alleged conspiracy to boycott. First, AD/SAT cites to an August 2, 1993 letter from Newhouse to AP president Louis Boccardi, which stated

---

26. AD/SAT alleges that NAA encouragement of AP's entrance into the market amounted to an endorsement of AdSEND, and apparently an implicit rejection of other ad deliverers. While the evidence does not support this conclusion, even if true an antitrust conspiracy is not established. In *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397 (7th Cir.1989), the Court citing the holding in *Consolidated Metal*, 846 F.2d at 292, stated that "when a trade association provides information (there, gives a seal of approval) but does not constrain others to follow its recommendations, it does not violate the antitrust laws." *Id.* at 399. In this case, there is no evidence that NAA constrained its

members to take any action with respect to either AD/SAT or AdSEND.

27. The strongest argument AD/SAT supplies to support NAA and NNN's involvement in the alleged conspiracy is a letter from Publicitas, NNN's "one order/one bill" clearing house which suggests a bundling of service between "one order/one bill" and AdSEND. However, written comments on the letter from NAA officials indicate that this idea of Publicitas, which is not a defendant in this action, was rejected. *See* PX 540.

that AP should move quickly if it plans to get into the ad delivery business because "there is a window of opportunity which AdSat [sic] might close if too much time goes by." PX 2. This statement simply encourages AP to quickly enter a market which AD/SAT might foreclose from competition. Because this statement encourages competition, it cannot be support for a finding of an agreement to restrain competition.

AD/SAT also asserts that Newhouse joined the alleged conspiracy by introducing AdSEND to several major advertisers. Considering that Newhouse is an AP Board member, and considering that he believed AdSEND to be a good product of general benefit to the newspaper industry, his actions are not surprising. More importantly, introducing a new competitor to a market's customers is conduct which the antitrust laws are designed to protect.

In addition, AD/SAT argues that rejection of the group proposal offered by AD/SAT to the Newhouse newspapers in August 1993, *see supra* part V.A.1.a, is sufficient evidence to allow it to survive Newhouse's summary judgment motion. In his affidavit in opposition to the motion, AD/SAT president Hilton states that Herrick of the *Star–Ledger* informed him that the decision to reject the group proposal was made by Newhouse. *See* Hilton Aff. ¶ 38. For several reasons, rejection of the group proposal is insufficient to create a genuine issue of material fact. First, there is direct evidence that decision making within the Newhouse newspapers is made at a local, paper by paper, level. *See* Declaration of Donald Newhouse ¶¶ 5, 7–9. Therefore, group proposals such as this one would not be considered. *See id.;* DX 368 at ADS 016353. AD/SAT supplies no evidence in contradiction. Even if the group proposal were considered by the Newhouse newspapers, remembering that it still included substantial affiliation fees for each newspaper, it would be unreasonable to infer a conspiracy to boycott from refusing to accept such a deal. Finally, the fact of the matter is that seven Newhouse papers which were included in the group proposal remain AD/SAT affiliates. Therefore, rejection of the group pro-

posal is not evidence of a concerted refusal to deal.

In its effort to implicate Newhouse in the conspiracy, AD/SAT relies most heavily on his retirement speech at the April 1994 NAA convention. In the speech Newhouse encouraged NAA members to "work with Associated Press and help our cooperative perfect its ability to transmit ads digitally from the advertisers' computer to our computer." PX 535 at 12. In addition, he said that "NAA is working with the Associated Press as AP develops a computer to computer advertising transmission system which will remove a barrier to the use of newspapers." *Id.* at 21. The speech also stressed the importance of collective action within the newspaper industry. *See id.* at 17.

Perhaps the most telling aspect of the speech is what it does not contain—any reference at all to AD/SAT. AD/SAT's opposition papers attempt to imply that AD/SAT was mentioned, if not by name, by quoting a part of the speech where Newhouse says: "We must identify useful technology—work to perfect it and develop the concepts that most effectively take advantage of it. We must not let our competitors have the advantage of creating the playing field and controlling the gateway." *Id.* at 15. First, it is not at all clear that this statement was meant to refer to AD/SAT. Because the newspapers are not competitors with AD/SAT, it seems unlikely that the statement would be in reference to AD/SAT. Finally, even if AD/SAT were an intended reference, it at most indicates that the newspaper industry must encourage competition with AD/SAT, not exclude it from the market through a group boycott.

By asking newspapers to work with AP, Newhouse, like NAA and NNN, is simply encouraging and assisting a new competitor in the market. By accepting Newhouse's invitation to work with AP, newspapers are not at the same time agreeing to refuse to deal with AD/SAT. The evidence reveals that papers can use more than one electronic delivery system. *See* DX 74; Deposition of Richard Atkins at 827–28.[28]

---

**28.** It is true that Newhouse encouraged the newspapers to engage in "collective action."

In sum, the evidence provided does not permit the Court to find that the actions of Newhouse in support of AP's development and marketing of AdSEND constitutes participation in a refusal to deal with AD/SAT in restraint of trade. Therefore, the Court grants Newhouse's motion for summary judgment as to the § 1 claim against him. The Court also grants summary as to AD/SAT's § 1 claim against Advance.[29] Finally, having granted all other defendants summary judgment as to AD/SAT's § 1 claim, the Court grants AP's motion for the same relief.

### B. *AD/SAT's Sherman Act § 2 Conspiracy Claim*

 Because, as discussed *supra* part V.A, the Court finds that all defendants lack a rational motivation to conspire, and because the evidence supplied reveals that all defendants had valid, independent reasons for their activities in relation to both AD/SAT and AP, the Court finds that AD/SAT cannot show that the newspapers, NAA, NNN, Newhouse, or Advance had a specific intent to monopolize. *See Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 189 (2d Cir.1992) (rational trier of fact cannot find § 2 liability if plaintiff offers no evidence to cast doubt on defendant's legitimate business explanations for its action). *See H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1019. Therefore, the Court grants summary judgment to all defendants as to AD/SAT's § 2 conspiracy to monopolize claim.

### VI. *AD/SAT's Motion for Reconsideration*

Based upon the reasons stated in this Court's April 24, 1995 Opinion and Order, and based upon this Opinion and Order, AD/SAT's motion for reconsideration of this

Court's decision to grant summary judgment to the *Lexington Herald–Leader* is denied.

### CONCLUSION

For the reasons stated above, AP's motion for summary judgment as to AD/SAT's Sherman Act § 2 claims against it is GRANTED. The summary judgment motions of all defendants as to AD/SAT's Sherman Act §§ 1 and 2 conspiracy claims are GRANTED. AD/SAT's motion for reconsideration is DENIED. The actions are DISMISSED.

**SO ORDERED.**

---

However, as pointed out in Newhouse's reply brief, *see* Joint Reply Memorandum of Newhouse Defendants at 30–32, the goals of this collective action included "removing barriers to advertising," *see* PX 535 at 17, and "satisfy[ing] the demand of advertisers for greater efficiency and effectiveness." *Id.* at 11. There is nothing in these statements which could be interpreted as anticompetitive, and certainly nothing which indicates participation in a scheme to boycott AD/SAT.

**29.** AD/SAT only ties Advance to this litigation by stating that "Advance caused its newspapers to do business with AD/SAT." First Amended Complaint ¶ 13. Summary judgment is appropriate for Advance because AD/SAT, in opposing summary judgment "may not rest upon the mere allegations or denials" of a pleading. Fed. R.Civ.P. 56(e).